IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Laura Arlene Walker-Conley, ) | Civil Action No. 6:14–1262-MGL-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on June 20, 2011, alleging that she became unable to work on March 12, 2008. The application was denied initially and on reconsideration by the Social Security Administration. On February 8, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and John S. Wilson, an impartial vocational expert, appeared during a video hearing on December 19, 2012, considered the case *de novo* and, on January 10, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the

Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 27, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

(2)    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 12, 2008, through her date last insured of December 31, 2012 (20 C.F.R § 404.1571 *et seq*).

(3)    Through the date last insured, the claimant had the following severe combination of impairments: fibromyalgia and Raynaud's syndrome (20 C.F.R. § 404.1520(c)).

(4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform less than the full range of light work[1] as defined in 20 C.F.R. § 404.1567(b) except she can frequently use her bilateral upper extremities for fine and gross manipulation. The claimant can occasionally climb ladders, ropes, scaffolds. She must avoid all exposure to hazards.

(6)    Through the date last insured, the claimant was capable of performing past relevant work as a rental car clerk, a receptionist, an office clerk, an office manager, a switchboard operator, and as a service advisor. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7)    The claimant was not under a disability, as defined in the Social Security Act, at any time from March 12, 2008, the

---

[1] Light work involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, as well as sitting, standing, or walking for six hours each in an eight-hour workday.

alleged onset date, through December 31, 2012, the date last insured  (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).  He

3

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

4

**EVIDENCE PRESENTED**

From 2008 through 2012, the plaintiff saw Mark F. Pelstring, M.D., of Southern Medical Associates, a few times per year for a variety of conditions. She reported pain and stiffness in her back, neck, feet, and shoulders, particularly during the first couple of hours in the morning, but Dr. Pelstring consistently indicated no range of motion restrictions, no swelling, no atrophy, no abnormal gait, and no weakness, by either actively checking the corresponding boxes on his treatment notes or by not checking boxes indicating deficiencies (Tr. 249-75, 279-85, 290-93, 305-08).

On June 11, 2008, the plaintiff was seen for hypertension, hypothyroid, and pain. She had pain in her neck, shoulder, hands, knees, and ankles. She was diagnosed with Raynaud's syndrome, hypothyroidism, obesity and arthralgias (Tr. 248-49). On December 16, 2008, the plaintiff was seen for pain. She reported anxiety, problems sleeping, and headaches (Tr. 272).

On January 16, 2009, the plaintiff still experienced fatigue and painful, stiff joints (Tr. 269). On April 17, 2009, the plaintiff was treated for increased pain. She had stiffness in her joints for two to three hours every morning, which returned every evening around 4:00 or 5:00. She had headaches with sensitivity to light and noise. Her headaches lasted 30 minutes to several hours and occurred three to four times a week (Tr. 267).

On July 17, 2009, the plaintiff reported pain in her shoulders, hips, and knees. She saw no change with an increase in the Cymbalta dosage. She continued to have problems sleeping (Tr. 265). On October 16, 2009, the plaintiff was seen for fatigue, edema, sleep problems, and pain and stiffness in her joints (Tr. 263).

On May 28, 2010, Dr. Pelstring treated the plaintiff for pain in her leg, an increase in her headaches, and sleep problems (Tr. 258). On September 24, 2010, the plaintiff reported increased fibromyalgia pain. She was taking Tramadol, and Ambien helped with her sleeping problems. She continued to have headaches (Tr. 256). On

November 15, 2010, the plaintiff stated that she had increased pain in knees and ankles upon first waking up.  Her symptoms increased with cold weather.  She had an increase in headache activity (Tr. 260).

On January 21, 2011, the plaintiff was seen for headaches, heartburn, stress, and urgency incontinence.  She was having frequent headaches, five to six times a week.  She experienced some nausea and light intolerance.  Her symptoms lasted hours to days (Tr. 254).  On May 27, 2011, Dr. Pelstring increased the prescription for Tramadol and added Trazodone and Imitrex to treat the plaintiff's migraine headaches.  She still had stiff and painful back and neck joints (Tr. 251, 253).   A left shoulder x-ray on August 26, 2011, was negative (Tr. 298). On September 23, 2011, the plaintiff had edema, heartburn, nausea, painful and swelling joints, and a tender left ankle. X-rays of the left ankle and left foot were negative (Tr. 281-82, 296-97).  On October 21, 2011, the plaintiff still had left foot pain (Tr. 280-281).

On August 27, 2011, Charles Rittenberg, M.D., conducted a "Comprehensive Whole Body Examination" at the state disability agency's request.  Dr. Rittenberg noted that Dr. Pelstring is the only doctor that the plaintiff saw; she did not see a rheumatologist (Tr. 276).  The plaintiff told Dr. Rittenberg that her hands "hurt all the time," she can only type or write for about ten minutes, she cannot raise her arms above her shoulders without pain, she has left knee pain, and her fingers turn purple and go numb (*id.*).  However, the plaintiff could get on and off the exam table without difficulty and could bend at the waist to ninety degrees (Tr. 277).  Dr. Rittenberg's examination revealed crepitus in the plaintiff's left knee and tenderness to palpation over her mid-back, but no swelling in her extremities, full range of motion in all joints, 5/5 muscle strength throughout, normal deep tendon reflexes, and no muscle atrophy (*id.*).

On September 6, 2011, state agency medical consultant, Jim Liao, M.D., reviewed the plaintiff's medical records and conducted a residual functional capacity

6

("RFC") assessment. Dr. Liao concluded that the plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, and stand/walk about six hours and sit about six hours in an eight-hour workday (Tr. 65). Dr. Liao found that the plaintiff had unlimited pushing/pulling abilities (including operation of hand and foot controls) and no manipulative limitations (*id.*). The plaintiff also had additional postural and environmental limitations, including no exposure to hazards and only occasional climbing of ladders, ropes, and scaffolds due to her pain and history of migraines (Tr. 65-66). Dr. Liao explained that the consultative examination showed that the plaintiff's joints "are still highly functional" (Tr. 66 (citing 276-77)). Also, Dr. Liao opined that the plaintiff's migraines were non-severe because they were effectively treated with medication (*id.*).

On December 8, 2011, a second state agency medical consultant, Hugh Wilson, M.D., conducted another RFC assessment and reached the same conclusions as Dr. Liao (Tr. 76-78).

On February 10, 2012, the plaintiff reported pain in her shoulder and neck areas. She also had pain in her hips. She exhibited some general edema. She continued to have chronic headaches. Her left knee was sore, and Dr. Pelstring considered steroid injections (Tr. 290-291).

On February 13, 2012, Dr. Pelstring completed a medical statement noting that he had treated the plaintiff since June 11, 2008. Her symptoms included pain, stiffness in multiple joints and muscle groups, edema, and recurrent migraine headaches. Her medical history included obesity, hypothyroidism, insomnia, fibromyalgia, degenerative joint disease, migraine headaches, hyperlipidemia, and hypertension. Dr. Pelstring opined that the plaintiff could stand for fifteen minutes at a time and sit for thirty minutes at a time. He stated that she could work two hours per day. She could occasionally lift five pounds and frequently lift zero pounds. She could occasionally bend, and occasionally manipulate objects with the right and left hand. She should never stoop, never balance, and never

7

raise her right or left arm above shoulder level. She would frequently need to elevate her legs during a workday. In his opinion, the plaintiff suffered from credible pain that was severe. Her long-term prognosis was guarded, and Dr. Pelstring did not think she could be employed in the future (Tr. 287).

On February 14, 2012, x-rays showed mild degenerative changes of the left knee (Tr. 294). On February 27, 2012, the plaintiff received an injection in her left knee (Tr. 292).

On June 15, 2012, the plaintiff was seen for allergies, migraine headaches and fibromyalgia. She had swelling of her feet and ankles (Tr.309). On October 19, 2012, the plaintiff had increased pain with increased stress. She had slight shortness of breath and nausea. She experienced pain, stiffness, depression, anxiety, and headaches (Tr. 306).

### *Administrative Hearing*

The plaintiff stated in her disability report that she stopped working in February 2007 because she quit her job when she moved from North Carolina to South Carolina because of her husband's job (Tr. 185). The plaintiff testified that she can no longer work because she has arthritis in her fingers, shoulders, knees, and back (Tr. 35). She testified that she cannot hold small items or use her computer "hardly at all," but she can cook twice per week and write letters. Her husband did 90% of the cooking (Tr. 35-36). She testified that she cannot raise her arms above her head, she cannot sit or stand in any one position for very long, her knees bother her when walking, and she has to be careful when going up or down stairs because she "never know[s] if [her] knees are going to work or not work" (Tr. 36). She described her daily pain as "like a toothache," ranging from a six to a nine on a ten-point pain scale (Tr. 40-41). The ALJ noted an x-ray that documented degenerative joint disease in the left knee. The ALJ asked the plaintiff if the injection helped. The plaintiff stated that it helped, but it never made the pain go away. There was never a day

where she did not have pain (Tr. 35-37).  Her pain was more severe when she was out of her comfort zone.  The weather changes, her emotions, or something physical, like having to pick up a gallon of milk, could increase her pain.  The plaintiff had been dealing with pain since she was 50 years old, and it had steadily worsened each year. (Tr. 39-43).

The plaintiff testified that she took medication for her high blood pressure that also helped with her Raynaud's disease.  The Raynaud's also affected the flexibility of her fingers and ability to grasp things.  She took medication for high cholesterol and Synthroid for hypothyroidism.  She also took medication for her fibromyalgia, but she had never been referred to a rheumatologist (Tr. 37-38, 43-44)  In addition to her medication, walking, napping, massages, and elevating her legs help alleviate her pain (Tr. 42).

The attorney questioned the plaintiff about her overactive bladder.  She stated that she went to the bathroom every half hour.  If she sneezed or coughed unexpectedly she wet her pants (Tr. 39-43).

Although the plaintiff did not include migraine headaches as a limiting condition in her disability report (Tr. 185), she testified that she also gets migraines three or four times per month, for which she takes medication.  A migraine could take her out of normal life for one to three days.  She had to keep her house dark and quiet if she had a migraine (Tr. 39-40).  She also had problems with memory loss.  She would forget what she was saying, and she had to write things down to remember them.  She sometimes felt like she was in a fog and walked differently because of her medications (Tr. 47-48).

The plaintiff testified that her husband does the vacuuming, mopping, yard work, and shopping, but she is able to drive, cook, and wash the dishes (Tr. 45-46).  She enjoys reading and doing crossword puzzles and was taking up needle point (Tr. 215).

The vocational expert classified the plaintiff's past work as that of rental car clerk, SVP 4, semi-skilled, light, DOT of 295.467-026; receptionist, SVP of 4, semiskilled, sedentary, DOT of 237.367-038; office clerk, SVP of 3, semi-skilled, light, DOT of 209.562-

010; office manager, SVP of 4, semi-skilled, light, DOT of 219.362-010; switchboard operator, SVP of 3, semi-skilled, sedentary, DOT of 235.662-022; and service advisor, SVP of 7, skilled, light, DOT of 620.261-018 (Tr. 50).

The ALJ proposed a hypothetical of a person of the plaintiff's age, education, and past work, who was limited to light work, but could occasionally climb ladders, ropes, or scaffolds, and avoid workplace hazards (Tr. 50). The vocational expert stated that the individual could perform all of the plaintiff's past work. The ALJ asked the vocational expert to consider an additional restriction of being able to frequently, not constantly, use both upper extremities for fine and gross manipulations. The vocational expert testified that the individual could still perform the plaintiff's past work (Tr. 50).

The ALJ added that the individual could only occasionally use both upper extremities for fine and gross manipulation. The vocational expert stated that the individual would not be able to perform the plaintiff's past work, but the individual could perform work as a surveillance system monitor, SVP of 2, unskilled, sedentary, with 550 jobs regionally and 74,470 jobs nationally, DOT of 379.367-010; food and beverage clerk, SVP of 2, unskilled, sedentary, with 1,790 jobs regionally and 215,390 jobs nationally, DOT of 209.567-014; and addressor, SVP of 2, unskilled, sedentary, with 500 jobs regionally and 96,330 jobs nationally, DOT of 209.587-010 (Tr. 51). The vocational expert testified that if the hypothetical claimant had to miss three or more days of work per month, it would eliminate all jobs (Tr. 52).

## ANALYSIS

The plaintiff was 47 years old on her alleged disability onset date and 52 years old on her date last insured. She graduated from high school and completed some college (Tr. 33). The plaintiff argues that the ALJ erred by (1) failing to perform a proper analysis of the opinion of treating physician Dr. Pelstring; (2) failing to properly explain the RFC

findings and the impact of her fibromyalgia; (3)  failing to consider the severity of her migraines; and (4)  failing to properly evaluate her credibility.

***Treating Physician***

The plaintiff first argues that the ALJ failed to properly consider the opinion of Dr. Pelstring (pl. brief at 15-20).  The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5).  *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, on February 13, 2012, Dr. Pelstring opined that the plaintiff could stand for fifteen minutes at a time and sit for thirty minutes at a time, work for two hours per day, occasionally lift five pounds and frequently lift zero pounds, occasionally bend and occasionally manipulate objects with the right and left hand, and never stoop, balance, or raise her right or left arm above shoulder level.  She would frequently need to elevate her legs during a workday (Tr. 287).  The ALJ gave Dr. Pelstring's opinion "little weight" and gave several reasons for this finding.  First, the ALJ explained that Dr. Pelstring's opinion was not supported by his own office notes (Tr. 22).  Dr. Pelstring consistently noted no range of motion restrictions, no atrophy, no abnormal gait, and no weakness, or did not check any boxes indicating deficiencies (Tr. 249-75, 279-85, 292-93, 305-08).  Next, the ALJ noted that Dr. Pelstring's opinion was inconsistent with the generally benign examination performed by Dr. Rittenberg (Tr. 22).  Dr. Rittenberg's examination revealed crepitus in the plaintiff's left knee and tenderness to palpation over the mid-back, but no swelling in her extremities, full range of motion in all joints, 5/5 muscle strength throughout, normal deep tendon reflexes, and no muscle atrophy (Tr. 277).  The plaintiff could get on and off the exam table without difficulty and could bend at the waist to ninety degrees (Tr. 277).

In affidavits in the record, the plaintiff and her husband state that the appointment with Dr. Rittenberg was "approximately 10 minutes" (Tr. 227-28).  In her brief, the plaintiff suggests that the "exceedingly brief" examination by Dr. Rittenberg should be disregarded as it did not comply with Social Security Ruling ("SSR") 12-2p, which provides:

> Because the symptoms and signs of [fibromyalgia] may vary in severity over time and may even be absent on some days, it is important that the medical source who conducts the [consultative examination] has access to longitudinal information about the person. However, we may rely on the [consultative examination] report even if the person who

12

> conducts the[consultative examination] did not have access to
> longitudinal evidence if we determine that the [consultative
> examination] is the most probative evidence in the case record.

2012 WL 3104869, at *5.  Dr. Rittenberg's report shows that he talked with the plaintiff

about her alleged symptoms and medical history, reviewed her treatment records, and

conducted a physical examination, including an examination of her extremities, a

neurological assessment, and musculoskeletal testing (Tr. 276-77).  Here, as it clear that

Dr. Rittenberg had access to longitudinal information about the plaintiff, this allegation of

error is without merit (*see* Tr. 277 (referencing Dr. Pelstring's treatment notes)).

The ALJ also cited objective testing that was inconsistent with Dr. Pelstring's

opinion (Tr. 22).  An X-ray of the plaintiff's left knee revealed only mild degenerative

changes (Tr. 294), and x-rays of the plaintiff's left ankle, left foot, and left shoulder were

normal (Tr. 281, 296-98).  The ALJ further noted that while Dr. Pelstring found that the

plaintiff's long-term prognosis was "guarded," he did not refer her to a physical therapist,

neurologist, rheumatologist, vascular surgeon, or a pain management specialist, as one

would expect in such a case (Tr. 22).

The ALJ gave "significant weight" to the opinions of the state agency medical

consultants, Drs. Liao and Wilson, who concluded that the plaintiff could perform the

lifting/carrying, sitting, standing, and walking requirements of light work, but with the

additional limitations of occasional climbing of ladders, ropes, and scaffolds, and avoidance

of exposure to hazards (Tr. 21; *see* Tr. 65-66, 76-78).  The ALJ was required to consider

the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §

404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly

qualified physicians, psychologists, and other medical specialists who are also experts in

Social Security disability evaluation.  Therefore, administrative law judges must consider

findings and other opinions of State agency medical and psychological consultants . . . as

opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).  Moreover, the ALJ gave the plaintiff the benefit of the doubt and further limited the RFC finding to frequent use of the bilateral upper extremities for fine and gross manipulation to account for the plaintiff's Raynaud's syndrome (Tr. 21).

Based upon the foregoing, the undersigned finds that the ALJ's evaluation of Dr. Pelstring's opinion was based upon substantial evidence and without legal error.

### Residual Functional Capacity

The plaintiff next argues that it is not clear from the ALJ's decision how her RFC is "less than the full range of light work" (pl. brief at 21).  Specifically, the plaintiff argues that the ALJ's failure to set out her specific limitations in terms of sitting, standing, walking, and lifting violates Social Security Ruling 96-8p, which requires that the RFC assessment "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  1996 WL 374184, at *7. While the ALJ did not set out these items specifically, it is clear from the entirety of the decision that the ALJ found that the plaintiff could meet the lifting, sitting, standing, and walking requirements of a full range of light work but was limited in other ways.  In her RFC finding, the ALJ noted that light work involves lifting no more than twenty pounds, no frequent lifting/carrying of more than ten pounds, and no sitting, standing, or walking for more than six hours (Tr. 19 n. 2).  The ALJ found that the plaintiff was, however, limited

inasmuch as she could only frequently use her bilateral upper extremities for fine and gross manipulation; she could only occasionally climb ladders, ropes, and scaffolds; and she must avoid all exposure to hazards (Tr. 19). Therefore, because of these additional limitations, she could not perform all light work. Further, the ALJ specifically gave "significant weight" to the opinions of the state agency medical consultants, who opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight hour day, and sit for about six hours in an eight hour day, which are the requirements for light work (Tr. 21; see Tr. 65-66, 76-78). Additionally, at the hearing, the ALJ asked the vocational expert to assume a hypothetical individual "who was limited to the light residual functional capacity but can occasionally climb ladders, ropes, or scaffolds, must avoid work place hazards, . . . and could frequently, not constantly, use both upper extremities for fine and gross manipulations" (Tr. 50-51). As it is clear that the ALJ found that the plaintiff could perform the functional areas of sitting, standing, walking, and lifting for a full range of light work activities, but was limited in other ways, this allegation of error is without merit.

The plaintiff also argues that the ALJ failed to properly evaluate the impact of her fibromyalgia on her RFC. The plaintiff contends that "[i]t is impossible" to review the ALJ's RFC finding because the plaintiff is confused about whether the ALJ accounted for her fibromyalgia-related limitations. The plaintiff argues that the ALJ contradicted herself by simultaneously finding that the plaintiff's fibromyalgia was a severe impairment and that she did not meet the criteria for establishing a medically determinable impairment of fibromyalgia as set forth in SSR 12–2p (pl. brief 26-27).

Here, the ALJ stated that she deemed the plaintiff's fibromyalgia a severe impairment because it was "objectively documented" and significantly limited the plaintiff's ability to perform basic work activities (Tr. 16). At step three, the ALJ found that the fibromyalgia did not meet or equal a listing (Tr. 18-19). Also at step three, the ALJ

15

considered SSR 12-2p, which sets forth the criteria for establishing whether a claimant has a medically determinable impairment of fibromyalgia. 2012 WL 3104869, at * 1.  Pursuant to SSR12-2p, beyond a diagnosis from a physician, a claimant must provide evidence satisfying one of two different sets of criteria—based on 1990 and 2010 criteria from the American College of Rheumatology respectively—and the diagnosis must not be "inconsistent with other evidence in the person's case record."  *Id*. at *2.  To satisfy the first set of criteria, a claimant must have:  (1)  a history of widespread pain; that is, pain in all quadrants of the body (right and left sides, above and below waist) and axial skeletal pain (cervical spine, anterior chest, thoracic spine, or low back) that has persisted for at least three months; (2)  at least eleven positive tender points on physical examination found bilaterally and above and below waist; and (3)  evidence other disorders that could cause the symptoms or signs were excluded. *Id*. at *2-3.  The ALJ found that the Dr. Pelstring did not identify 11 of 18 positive trigger points bilaterally and failed to note any trigger point findings (Tr. 18).  The plaintiff does not appear to dispute this finding.  To satisfy the second set of criteria, a claimant must have:  (1)  history of widespread pain (as above); (2) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3)  evidence other disorders that could cause those manifestations were excluded. 2012 WL 3104869, at *3.  The ALJ found that the objective medical evidence of record did not indicate the there were repeated manifestations of six or more fibromyalgia symptoms and whether other disorders were excluded (Tr. 18).  The plaintiff  argues that the record shows fatigue, poor sleep, cognitive problems, depression, and anxiety and makes the circular argument that because fibromyalgia was diagnosed, other conditions must have been excluded (pl. brief at 27).  The argument fails.  Notably, the plaintiff herself has not cited six or more fibromyalgia

16

symptoms that appear repeatedly in the record, and she has cited absolutely no evidence in the record that other disorders that could cause the symptoms she cited were excluded.

While the ALJ's decision is not a model of clarity with regard to the plaintiff's fibromyalgia, it is clear that the ALJ fully considered it in assessing the plaintiff's RFC. The ALJ discussed the plaintiff's testimony regarding her fibromyalgia symptoms, Dr. Pelstring's treatment, the plaintiff's daily living activities, and the medical opinions from Drs. Rittenberg and Pelstring that addressed her fibromyalgia (Tr. 20-22). The ALJ weighed all of the evidence and issued an RFC that accounted for her fibromyalgia symptoms by limiting her to light work with only frequent use of her bilateral upper extremities for fine and gross manipulation, no exposure to hazards, and no more than occasional climbing of ladders, ropes, and scaffolds (Tr. 19). The decision indicates that the ALJ fully considered the plaintiff's fibromyalgia and specifically accounted for the credibly-established limitations in the RFC assessment. Based upon the foregoing, the undersigned finds that the RFC finding is based upon substantial evidence and without legal error.

### Severe Impairments

The plaintiff next argues that the ALJ failed to properly consider the severity of her migraines (pl. brief at 23-25). The ALJ acknowledged the plaintiff's testimony that she gets migraines three or four times per month, for which she takes medication (Tr. 20; *see* Tr. 39-40). Then at step two, the ALJ recognized that the plaintiff was diagnosed with migraines and received treatment for them, but the ALJ determined that this impairment was not severe because the medication controlled the symptoms (Tr. 16-17). Substantial evidence supports this finding. An impairment is considered "severe" only if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (the "'mere presence of a condition is not sufficient to make a step-two showing'"; rather, the

claimant must show "how it significantly limits her physical or mental ability to do basic work activities") (citations omitted).  "Basic work activities" include:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2)  Capacities for seeing, hearing, and speaking;
>
> (3)  Understanding, carrying out, and remembering simple instructions;
>
> (4)  Use of judgment;
>
> (5)  Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6)  Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

Here, despite finding that the plaintiff's migraines were not severe, the ALJ considered her migraines throughout the rest of the sequential evaluation process.  As noted by the Commissioner, the plaintiff did not even include migraines as a limiting condition in her disability report, which she filed in conjunction with her application for benefits (Tr. 185).  Further, the plaintiff indicated that she enjoyed reading and doing crossword puzzles and was taking up needlepoint (Tr. 215), activities that would be precluded by severe migraines.  Lastly, Dr. Liao opined that the plaintiff's migraines were non-severe because they were effectively treated with medication (Tr. 66).  At step three, the ALJ correctly stated that there was no listing specifically related to migraines, but she considered the migraines under the neurological-impairment listings and concluded that the migraines did not meet or medically equal the listed impairments.  At step four, the ALJ "considered the cumulative effects of the claimant's alleged impairments, both severe and nonsevere, on the claimant's ability to work" (Tr. 19.).  In accordance with the state agency physicians' conclusions that the plaintiff should be limited to no exposure to hazards and occasional climbing of ladders, ropes, and scaffolds due to her pain and history of

migraines (Tr. 65-66, 76-78) – opinions that the ALJ gave significant weight (Tr. 21) – the ALJ included these migraine-related limitations in the RFC finding (Tr. 19). *Washington*, 698 F. Supp. 2d at 580 (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). Based upon the foregoing, this allegation of error is without merit.

### Credibility

Lastly, the plaintiff argues that the ALJ failed to properly evaluate her credibility (pl. brief at 28-31). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported

by the evidence in the case record." 1996 WL 374186, at *4.  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

> (1)    the individual's daily activities;
>
> (2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3)    factors that precipitate and aggravate the symptoms;
>
> (4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. § 404.1529(c).

At the hearing, the plaintiff testified that she can no longer hold small items or use her computer "hardly at all" (Tr. 35-36). She testified that she cannot raise her arms above her head, she cannot sit or stand in any one position "for very long," her knees "bother" her when walking, and she has to be careful when going up or down stairs because she "never know[s] if [her] knees are going to work or not work" (Tr. 36).  The ALJ considered her testimony and found that while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and liming effects of those symptoms were not fully credible (Tr. 20).  In

21

making this finding, the ALJ first discussed the plaintiff's treatment history (Tr. 20-21). Despite the plaintiff's alleged disabling impairments that impacted almost every area and system of her body, she saw only one physician, Dr. Pelstring, a primary care physician whom she saw only a few times per year (Tr. 21). Dr. Pelstring never referred the plaintiff to a neurologist, rheumatologist, pain specialist, or even a physical therapist (Tr. 21-22). Additionally, Dr. Pelstring never prescribed an ambulatory assistive device (Tr. 22). The plaintiff also never went to the hospital since her alleged onset date of disability (Tr. 21). Second, the ALJ discussed the plaintiff's activities of daily living, which were "inconsistent with her allegations of such significant functional limitations" (Tr. 21). She was able to drive, cook, and wash the dishes (Tr. 45-46). She enjoyed reading and doing crossword puzzles, and was taking up needlepoint (Tr. 215). Third, Dr. Rittenberg's consultative examination and the opinions of the two state agency physicians contradicted the plaintiff's claims of disabling symptoms. Dr. Rittenberg's examination revealed crepitus in the plaintiff's left knee and tenderness to palpation over the mid-back, but no swelling in her extremities, full range of motion in all joints, 5/5 muscle strength throughout, normal deep tendon reflexes, and no muscle atrophy. The plaintiff could get on and off the exam table without difficulty and could bend at the waist to ninety degrees (Tr. 277). In addition, both state agency medical consultants, Drs. Liao and Wilson, concluded that the plaintiff's subjective complaints were only partially credible, and she could perform a limited range of light work (Tr. 65-66, 76-78). The ALJ gave these opinions "significant weight" (Tr. 21). Based upon the foregoing, substantial evidence supports the ALJ's credibility assessment, and the undersigned finds no error.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 8, 2015
Greenville, South Carolina